IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BINI DAHLMAN                            :

                                        :

    v.                                  :    Civil Action No. DKC 10-2993

                                        :

INEZ TENENBAUM, Chairman                :
U.S. Consumer Product
Safety Commission                       :

                                        :

**MEMORANDUM OPINION**

Presently pending and ready for review in this case involving alleged disability discrimination is the motion to dismiss or for summary judgment filed by Defendant Inez Tenenbaum, Chairman of the United States Consumer Product Safety Commission (ECF No. 6).  The issues have been fully briefed and the court now rules, no hearing deemed necessary.  Local Rule 105.6.  For the reasons that follow, Defendant's motion will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background**

Plaintiff Belinda "Bini" Dahlman was a Product Safety Investigator ("PSI") with the Consumer Product Safety Commission ("CPSC") from 1998 until 2005.  Defendant Inez Tenenbaum is the Chairman of the CPSC.  Dahlman suffers from major depressive disorder and post-traumatic stress disorder.  As a result, she was unable to investigate any death or serious injury cases as a

PSI. She contends that the Defendant discriminated against her in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, by failing reasonably to accommodate her disability in three primary ways: (1) by not accommodating her request to assign her only non-death-related investigations and instead transferring her to the position of Compliance Officer, (2) by failing to rehire her to a PSI position several weeks later, and (3) by failing to accommodate her request to tele-work three days a week as a Compliance Officer. Dahlman also contends that these three acts constitute retaliation and discriminatory harassment in violation of the Rehabilitation Act.

**1. Product Safety Investigatory Position**

The CPSC is an independent federal regulatory agency established by the Consumer Product Safety Act, codified at 15 U.S.C. § 2053, *et seq.* The CPSC "has broad authority to establish and enforce safety standards and product bans, and to seek remedial action to alleviate risk to consumers from hazardous products in the marketplace." (ECF No. 6-4, at 2). PSIs work in assigned geographic areas throughout the United States to help the CPSC achieve its goals. The basic job description for PSIs has remained the same over the years, although the wording of the written job descriptions has changed. In 1987, PSIs were responsible for "receiving and investigating industry and trade complaints, surveillance of

industries subject to Commission jurisdiction, evaluation of consumer products, coordination with other Government agencies and implementation of information and education programs." (*Id.*). The description further provided that a PSI performs "the full range of inspection and investigative functions to protect consumers from unreasonable risk of injury, illness, or death due to dangerous consumer products." (*Id.*).[1] PSIs are supervised by the CPSC's Office of Field Operations. In addition, PSIs are responsible for contributing news reports of fatal incidents involving consumer products to the agency headquarters for inclusion in the daily "overnight news reports". (ECF Nos. 6-5, 6-6).

In 1998, the CPSC received funding for the equivalent of 480 full-time positions (FTEs) for the entire agency. As the CPSC's funding decreased relative to rising salaries, the number of FTEs decreased. By 2005, the CPSC had only 440 FTEs. In 2006, the agency only received funding for 420 FTEs. (ECF No. 6-3). Despite the downward trend in overall agency funding, the number of PSIs increased significantly in 2004 when the CPSC converted all of its other field positions to PSI

---

[1] The 2001 PSI position description stated in the introduction that the PSIs are responsible for "performing complex and sensitive inspection and investigative functions to protect consumers from unreasonable risk of injury, illness or death due to dangerous products." (ECF No. 6-4, at 6).

positions in order to conserve resources. Thus, in 2003 the CPSC had only 76 PSIs, but by 2004 the number increased to 99. In 2005, however, the number of PSIs decreased to 82.

In 1998, when Dahlman began working as a PSI, she was one of two PSIs assigned to the D.C. Metropolitan area. (ECF No. 6-7). In 2005, the other PSI in the region accepted an early retirement buyout, and Dahlman became the only PSI assigned to the region. There were other PSIs assigned to other parts of Maryland and Virginia, however.

### 2. Dahlman's Disability

Dahlman was diagnosed with depression as early as 1995. (ECF No. 6-8, at 10). At that time, Dahlman recalls that she was unable to eat, walk, work, or take care of herself at all. (ECF No. 6-9, at 10). At the time, she was employed as a background investigator with the Department of Defense and worked out of her home. (*Id*. at 11). She saw a psychiatrist who prescribed medicine for anxiety and depression. In 1998, a new doctor, Dr. Robert Johnson, diagnosed her with major depressive episode-recurrent. (*Id*.). At that time Dahlman was experiencing another episode of depression. The record is unclear as to the trigger of the 1998 episode. Dr. Johnson recalls that it was triggered by Dahlman's experience with her family over Thanksgiving. (*Id*.). Dahlman recalls, however,

that it was brought on by her exposure to death in her investigatory work as a PSI.

Dahlman's depression significantly impacted her ability to sleep, her memory, her ability to concentrate, and her ability to take care of herself and her family, particularly during severe episodes. Dahlman experienced such severe difficulty sleeping that she has slept in a different room from her partner since 1999, and also has such severe fatigue that on occasions she sleeps for nine to twelve hours a night in addition to naps. (ECF No. 19-4, at 1; ECF No. 19-10, at 1). During major episodes she has crying spells, a complete loss of appetite, and is completely debilitated. (ECF No. 19-2, at 2; ECF No. 19-10, at 1). Her partner, Mark Campfield, testified that during these periods he has to feed her, brush her teeth, force her to shower, and carry her up and down stairs. (*Id.*).

In 2006, Dahlman began seeing Dr. Norman Wilson who diagnosed her as suffering from post-traumatic stress disorder in addition to major depressive disorder. (ECF No. 19-66, at 2). In his opinion, working on death investigations triggered Dahlman's PTSD and exacerbated her depression.

### 3. Dahlman's Tenure with the CPSC

Dahlman was first hired as a PSI in March 1998. That August she voluntarily resigned and told her supervisor at the time, Bruce Schwartz, that she was resigning because she could

not handle the death investigations. (ECF Nos. 6-12, 6-13, and 19-4, at 4). In February 1999, Dahlman was rehired as a PSI, having received an oral commitment from Schwartz that she would not be required to conduct any death or serious injury investigations. (ECF No. 6-12, at 3-4; ECF No. 6-13, at 29-31; ECF No. 8, at 86-87). There is some disagreement between Dahlman and Defendant as to whether she was told she would not have to work on death investigations under any circumstances or only so long as another PSI was available to work in her place.

From 1999 until January 2003, Dahlman was assigned to work on death investigations on four occasions. In early 1999, Dahlman's supervisor at the time, William Gentry, assigned her a case involving a death that had occurred over a year earlier because he mistakenly thought that Dahlman was only to be excluded from recent death assignments. (ECF No. 6-14). Gentry's supervisor, Ray Benson, then explained that Dahlman was not to be assigned to any death cases whatsoever, and she was reassigned. (*Id.*). In early 2002, Dahlman was again assigned a death investigation by her new supervisor, Pamela Meadows-Robinson. (ECF No. 6-15, at 6). Meadows-Robinson had not been informed of the restriction on Dahlman's assignments prior to that time. (*Id.*). Upon learning of the restriction from Dahlman herself, Meadows-Robinson spoke with her supervisors who confirmed that death investigations should not be assigned to

Dahlman if there was another PSI available.  (*Id.*).  On another occasion, Meadows-Robinson accidentally assigned Dahlman to a death investigation because her cursory review of the source document did not indicate that the investigation involved death. (*Id.*).  The fourth time Dahlman was assigned to a death investigation was on January 10, 2003.  Meadows-Robinson intentionally assigned this work to Dahlman and explained that no other PSI was available and Dahlman would only have to contact police, fire, and medical examiners and not the victim's family.  (*Id.*).  Dahlman reiterated that she could not complete this assignment, and Meadows-Robinson arranged a meeting among herself, Dahlman, and Carol Cave, the Director of Field Operations, to clarify the scope of Plaintiff's abilities and job limitations.  (*Id.* at 7; ECF No. 6-5, at 3-4).  The result of the meeting was that Cave and Meadows-Robinson agreed that they would continue to avoid assigning Dahlman to death investigations whenever possible, but they informed Dahlman that they might have to assign her to such cases in the future as staffing levels changed.  In addition, Dahlman requested that she be notified if the other PSI in the D.C. metropolitan area, Dave Gudes, decided to retire or resources were otherwise diminished.

In 2005, Dave Gudes accepted a buy-out and the CPSC was unable to fill his position, leaving Dahlman as the only PSI in

the D.C. Metropolitan region. At the request of Meadows-Robinson, Dahlman submitted a formal "Request for Reasonable Accommodation" identifying herself as a person with the disability of "Major Depressive Episode (Recurrent)" and requesting the CPSC accommodate her by not assigning her to death investigations or related tasks. (ECF No. 6-19). Dahlman attached a one-page statement from Dr. Robert Johnson to her request wherein Dr. Johnson stated that he had been treating Dahlman since 1998 and she suffered from "major depressive disorder, precipitated by her experience doing death cases." (*Id.*). Meadows-Johnson responded to the request by asking for "medical documentation about Ms. Dahlman's medical condition and the necessity for any changes in work conditions or duty assignments." (ECF No. 6-20). Dahlman's counsel responded that the requested information had been provided already. (ECF No. 6-21). On December 5, 2005 Dahlman filed an informal EEO complaint of discrimination alleging harassment based on the duplicative request for additional medical documentation. (ECF No. 19-27)

The Agency issued its response to Dahlman's request on December 6, 2005. It decided to reassign Dahlman to a position as a compliance officer at CPSC Headquarters in Bethesda, where Dahlman would not be required to deal with any compliance issues that would contain death reports or any other tasks related to

death. (ECF No. 6-22). The decision letter indicated that the Agency believed conducting death investigations was an essential function of the PSI position. (*Id.*). Cave has stated that several other potential accommodations were considered, including reassigning Dahlman to an epidemiology position where the majority of the death data is reviewed by contractors and all investigations were conducted by phone, a 50-50 split between Dahlman's current PSI position and the epidemiology group, and reassigning Dahlman to the Office of Public Affairs. (ECF No. 19-45, at 12-13).

Effective January 8, 2006, Dahlman was reassigned to the compliance officer position at the same grade, step, and pay level as her former PSI position. Shortly thereafter, Dahlman applied for the vacancy to fill her old PSI position. Another applicant, Shawn Cerruti, was selected for the position. Then, in June 2006, Dahlman requested accommodations in her position as a compliance officer. Specifically she asked to telework three days a week to alleviate her symptoms of fatigue and lack of concentration. Her new supervisor, Richard Stern, denied the request because the division's policy only allowed new employees a teleworking option of one day per week after six months in a position and because 30-50% of Dahlman's work involved samples that could not be taken home. Stern did offer Dahlman one day of telework a week and provided private space in office

conference rooms for her to take rest periods after obtaining
approval.

**B.    Procedural Background**

Dahlman filed a formal EEO complaint against Defendant on
December 5, 2006, and subsequently amended it on June 6 and
August 30, 2006.    The EEO complaint alleged that for
discriminatory or retaliatory reasons Defendant subjected
Dahlman to harassment from 2001 through 2006, denied her request
for reasonable accommodation in her position as PSI,
involuntarily reassigned Plaintiff to the compliance division,
made repeated and unnecessarily duplicative requests for medical
documentation, did not select her for the PSI position that
opened up after her reassignment, denied her request for
accommodation in her position as a compliance officer, and
continued to subject her to a hostile work environment in the
compliance division.    On April 16, 2007, Dahlman requested that
Defendant issue a Final Agency Decision regarding her EEO
complaint.    The agency issued its decision on June 15, 2007,
finding in Defendant's favor.    Dahlman then appealed to the
Equal Employment Opportunity Commissions' Office of Federal
Operations, which issued another decision in Defendant's favor
on April 15, 2010.    Dahlman filed a request for reconsideration
of this decision, and it was denied on July 27, 2010.

Dahlman filed her complaint in this court on October 22, 2010, asserting twelve counts for violations of Section 501 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (ECF No. 1). Count I alleges discriminatory harassment when Defendant repeatedly assigned Dahlman to death investigations as a PSI, denied her request for reasonable accommodation, and involuntarily reassigned her to the compliance division. Counts II and III allege discriminatory and retaliatory denial of a reasonable accommodation when Dahlman was a PSI. Counts IV and V allege discriminatory and retaliatory involuntary reassignment of Dahlman from her position as PSI. Count VI alleges that Defendant's repeated and duplicative requests for medical documentation violated the Rehabilitation Act. Counts VII and VIII allege discriminatory and retaliatory denial of reasonable accommodations to Dahlman when she was a compliance officer. Counts IX and X allege discriminatory and retaliatory non-selection of Dahlman for the PSI position in 2006. Count XI alleges that Defendant discriminated against Dahlman by creating a hostile work environment in her position as compliance officer. Finally, count XII alleges that Defendant retaliated against Dahlman for filing her EEO complaint by not assigning her any substantive work, denying her training request, and denying her requested accommodation when she was working as a compliance officer.

## II.  Standard of Review

Defendant has moved to dismiss or for summary judgment. Because both parties rely extensively on matters outside the pleadings, the court will treat the motion as a motion for summary judgment. *See Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v.*

*Jenney*, 327 F.3d 307, 314 (4ᵗʰ Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

Defendant argues that summary judgment is appropriate on all counts. As a threshold matter, Defendant contends that Dahlman cannot establish that she is a "qualified individual with a disability" covered by the Rehabilitation Act because her condition did not substantially limit her from major life activities and because she has not shown she was able to perform the essential functions of her position, with or without reasonable accommodation. Additionally, Defendant argues that the CPSC properly denied Dahlman's request for accommodation as a PSI and properly modified her requested accommodation as a compliance officer and that none of the alleged harassments rise to an actionable level. (ECF No. 6-1, at 2-3). In response, Dahlman argues that she has established a genuine dispute of material fact with respect to at least three issues that preclude the court from entering summary judgment: (1) whether the CPSC would have incurred undue hardship if it had granted

13

Dahlman's request for reasonable accommodation in her position as PSI; (2) whether conducting death investigations is an essential function of the PSI job; and (3) whether Dahlman's condition substantially limits her in one or more major life activities. In addition, Dahlman argues that she is entitled to additional discovery and it would be premature for the court to grant summary judgment at this time.

In determining whether an employer has discriminated under the Rehabilitation Act, courts utilize the standards that are applied under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.*, and the provisions of sections 501 through 504, and 510 of the ADA, 42 U.S.C. §§ 12201-12204 and 12210. *Hooven-Lewis v. Caldera,* 249 F.3d 259, 268-69 (4th Cir. 2001); *see also* 29 U.S.C. § 791(g). The general rule is that no covered entity shall discriminate against a qualified individual with a disability because of that disability. *See* 42 U.S.C. § 12112(a). Discrimination under the Rehabilitation Act or ADA includes "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of the applicant." *Id.* § 12112(b)(1). Discrimination also includes:

> not making reasonable accommodations to the
> known physical or mental limitations of an
> otherwise qualified individual with a

14

> disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

*Id.* § 12112(b)(5)(A).

**A.    Dahlman's Claims Arising From Her Tenure as a PSI**

**1.    Individual with Disability**

Before considering whether Defendant's acts constitute discrimination, either by failing to make reasonable accommodations or otherwise constituting harassment, Dahlman must establish that she was a qualified individual with a disability.  An "individual with a disability," or handicap, is defined as one who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (ii) has a record of such an impairment; or
>
> (iii) is regarded as having such an impairment.

Rehabilitation Act, 29 U.S.C. § 705(20)(B); 29 C.F.R. § 1614.203(a)(1); *see also* Americans with Disabilities Act, 42 U.S.C. § 12102(2) (giving an almost identical definition for "individuals with a disability").  Courts have defined major life activities as those activities of "central importance to most people's lives" and "that the average person in the general population can perform with little or no difficulty." *Toyota*

*Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 269 (4th Cir. 2001); *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 254-55 (4th Cir. 2006), *cert. dismissed*, 548 U.S. 941 (2006).  EEOC regulations state that the impairment must limit functions "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i) (2010).[2]  The question of whether an individual is disabled "is a question of law for the court, not a question of fact for the jury."  *Rose v. Home Depot U.S.A.*, 186 F.Supp.2d 595, 608 (D.Md. 2002) (citing *Hooven-Lewis*, 249 F.3d at 268).

Defendant argues that Dahlman cannot meet the statutory requirements for a disability.  Defendant concedes that Dahlman had at least one mental impairment during the relevant time period, but argues that this impairment did not substantially limit any major life activity.  (ECF No. 6-1, at 19).  Moreover, Defendant argues that Dahlman cannot prove that the CPSC regarded her as disabled, irrespective of whether her condition actually met the statutory requirements.  In response, Dahlman

---

[2]  The persuasive authority of the EEOC regulations in interpreting the ADA has not been resolved by the Supreme Court of the United States or the United States Court of Appeals for the Fourth Circuit.  *See, e.g., Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467-68 (4th Cir. 2002), *cert. denied*, 537 U.S. 827 (2002).

argues that the record shows that she was unable to complete major life activities, such as sleeping, or concentrating on one activity, or taking care of herself, and that the CPSC has already admitted that it viewed her as disabled because it attempted to accommodate her disability, albeit to an inadequate degree. (ECF No. 19, at 25-38).[3]

As the plaintiff, Dahlman bears the burden of establishing that she was a qualified individual with a disability. *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir. 1986). In addition, the relevant inquiry is not whether Dahlman's evidence is adequate to establish that she has a disability now, but whether the agency had reason to know that she had a disability at the time of the request for accommodation. *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, n.3 (4th Cir. 2002) (citing *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000); *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998)), *cert. denied*, 526 U.S. 1144 (1999)); *Davis v. Thompson*, 367 F.Supp.2d 792, 802 (D.Md. 2005) ("the relevant question is whether the [agency] had reason to know [plaintiff] had a

---

[3] The issue of whether Defendant regarded Dahlman as disabled is irrelevant to the failure to accommodate claims because employers are not obligated to provide reasonable accommodations to individuals who satisfy only the "regarded as" prong of the definition of disability. *See* 29 C.F.R. § 1630.2(o)(4).

disability during the time period he claims he fell within the protection of the Rehabilitation Act").

The activities Dahlman has identified-sleeping, caring for oneself and concentrating-are now expressly recognized as major life activities in the ADA. *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, § 4(a), 122 Stat. 3553, 3555 (codified at 42 U.S.C. § 12102(2)(A)). The pre-2009 version of the ADA did not include a list of recognized activities, however, and neither the Supreme Court nor the Fourth Circuit has addressed whether they were considered major life activities before 2009, the operative timeframe for Dahlman's claims. *See Farrelly v. Acme Markets, Inc.*, No. CCB-08-1992, 2011 WL 501896 (D.Md. Feb. 10, 2011) (slip copy). There are prior decisions from the Fourth Circuit, however, indicating that disruptions in sleep, concentration, or caring for oneself can be qualifying disabilities if the limitation is sufficiently substantial. *See, e.g., E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352-53 (4th Cir. 2001) (finding that EEOC had failed to demonstrate that plaintiff's lack of sleep was worse than the quality of sleep of the general population or that her forgetfulness rose to the level of substantial limitation). Whether a particular plaintiff is substantially limited in a major life activity "is thus determined by examining the unique facts and circumstances surrounding his particular impairment." *Heiko*, 434 F.3d at 257

(citing *Toyota Motor Mfg.*, 534 U.S. at 198; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4ᵗʰ Cir. 1995)). "Among the factors courts should consider in making the substantial limitation determination are the impairment's 'nature and severity' and 'expected duration.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(ii)). Sporadic or otherwise temporary impairments do not qualify. *Id.*

Dahlman points to statements from her family, friends, and treating physicians as evidence of the severity of her disability and its impact on her day-to-day life. With the benefit of this evidence and testimony it would be hard to say today that her impairments do not substantially impact major life activities. It is more difficult to make this determination considering only the evidence and information that the CPSC had in its possession in 2005 and 2006. The information provided by Dahlman about her condition in her formal request for accommodation in 2005 was quite limited. The request stated:

> Dahlman suffers from Recurrent Major Depressive Episodes. The depressive episodes are precipitated by engaging in death investigations. When Ms. Dahlman is not participating in such cases, she is able to function very well at work. However, any type of involvement in the investigations can lead to severe consequences in her ability to function both in the workplace and in daily activities. In the past her involvement in death investigations has

19

> resulted in situations where she was completely unable to function, meaning that she could not eat or get out of bed and suffered from severe nightmares. Clearly she suffers from a serious disability which substantially limits her major life activities.

(ECF No. 6-19, at 2). The CPSC asked Dahlman's attorney to provide "specific medical information and documentation regarding the medical issue that you raised concerning her recurrent 'major depressive episodes'" and "any information her physician considers necessary to adequately document her medical condition, her ability to work in her position, and any restrictions on her work." (ECF No. 6-20). Dahlman's counsel did not provide any additional materials; instead he attempted to articulate how his initial request had included the information needed to accede to Dahlman's request for accommodation. (ECF No. 6-21). Neither the initial request for accommodation nor the follow-up letter detailed the manner and extent to which Dahlman's major depressive disorder limited her ability to conduct major life activities. From this record, it would be difficult to conclude that Dahlman has met her burden. An ultimate conclusion on this issue is unnecessary, however, because, as discussed next, Dahlman cannot establish that she was able to perform the essential functions of the PSI position with or without reasonable accommodation.

## 2. Qualified Individual

Assuming that Dahlman could prove she had a disability impacting major life activities, she must also prove that she was a qualified individual, meaning that she could (1) satisfy the prerequisite skills and education for the position held or desired and (2) perform the essential functions of the position with or without reasonable accommodation. The parties do not dispute that Dahlman had the prerequisite skills; the focus of their disagreement is whether conducting death investigations was an essential function of the PSI position. Predictably, Defendant argues that it is; and Dahlman contends it is not or, at the very least, that there is a material factual dispute that precludes summary judgment.

Assessing whether an individual is qualified is a two-part inquiry: (1) can the individual perform the essential functions of the job in question, and (2) if not, would reasonable accommodations made by his employer enable him to perform those functions. *See Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987); *Myers v. Hose*, 50 F.3d 278, 281-82 (4th Cir. 1995). EEOC regulations define essential functions as "the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of

the position." 29 C.F.R. § 1630.2(n)(1). The regulations further provide:

> A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2)(i)-(iii). Evidence that may be considered when determining whether a function is essential includes:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or

        (vii) The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3). While the plaintiff has the burden of showing that she is capable of performing the essential functions, the defendant "should bear the burden of proving that a given job function is an essential function." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 35 (1st Cir. 1000) (noting that the defendant "has better access to the relevant evidence" to meet this burden); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) ("if a disabled individual is challenging a particular job requirement as unessential, the employer will bear the burden of proving that the challenged criterion is necessary."). The text of the ADA specifically notes that:

> for the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

    Here the bulk of the factors support Defendant's classification of conducting death investigations as an essential function of the PSI position. First, Defendant considers the task an essential function. (*See* ECF No. 6-22).

Second, although the job description for the PSI position does not expressly state "conduct death investigations" it does say that Product Safety Investigator will perform "the full range of inspection and investigative functions to protect consumers from unreasonable risk of injury, illness or **death** due to dangerous consumer products." (ECF No. 6-6, at 2) (emphasis added). In addition some of the "Duties and Responsibilities" listed are:

> Conducts investigations of product related accidents and potential accident situations, which lack precedents and guidance due to products variable nature. Collects information and data necessary to perform comprehensive evaluations, to include review of official reports (police, medical, fire, etc.), interviews with victims, witnesses and other parties.

and

> Gathers pertinent information through application of effective investigative interviewing and fact-finding techniques.

(*Id.* at 3). Likewise the Vacancy Announcement posted for the PSI position, created by Dahlman's reassignment to the compliance division, listed as one of the position's duties: "conducting investigations by interviewing consumers, fire and police officials, as well as other knowledgeable officials and witnesses on product related injuries and death." (ECF No. 6-27). Additionally, the very first sentence of the vacancy announcement proclaims "[w]e are looking for individuals who would like to come work for a small, independent regulatory

agency dedicated to saving lives." (*Id.*). The only reasonable conclusion one could draw from these materials is that a portion of the investigative duties of a PSI comprises cases where the product related accidents resulted in death or near fatality. Indeed product accidents resulting in death are the most serious kind and arguably have the most urgent and pressing need for investigation. It would make no sense if a PSI's duties did not include investigations of death cases. Dahlman is correct to note that conducting death investigations is not the sole duty of a PSI, (ECF No. 19, at n.20), but her attempts to argue that the absence of an explicit reference to death investigations meant that a PSI could fulfill her job requirements without investigating any deaths is unconvincing.

The third factor, the amount of time spent on the job conducting the function, is inconclusive. The data provided show that death investigations are not the majority of work done by PSIs, and, in fact, the number of such investigations was declining in the relevant time frame. (*See* ECF No. 19-45, at 10 (showing that number of assigned death investigations nationally declined from 1147 to 956 from 2003 to 2005 and from 32% to 22% of the total investigations conducted)). Still, the number of death investigations conducted in the region was significant. The other PSI assigned to the D.C. metropolitan area, Dave Gudes, conducted 36 death investigations in Maryland, Virginia,

and the District of Columbia from 2003 to 2005, (*see* ECF No. 19-53)[4], and CPSC Director of Field Operations, Carol Cave, estimated that there were 6-10 death cases in the Washington, D.C. area each year. (ECF No. 6-8, at 16).

The parties dispute the import of the fourth factor, the consequences of not requiring Dahlman to perform the function. Defendant relies on the fact that the only other PSI assigned to the D.C. metropolitan region retired, leaving the region with no PSI to cover death investigation if Dahlman could not. Dahlman argues that PSIs assigned to neighboring states could easily cover any death investigations and notes that travel is a required part of the PSI's job. But as noted above, Mr. Gudes conducted at least 36 death investigations from 2003 and 2005. This is not an insignificant number and having no one available in the immediate vicinity to conduct such investigations could prove problematic for the agency.

Factor five is not applicable as there is no collective bargaining agreement in place. Factors six and seven support Defendant's position. With the exception of Dahlman, all other current and former PSI's have performed death investigations.

---

[4] Dahlman deceptively downplays the number of death investigations conducted by Mr. Gudes by only tallying his investigations in D.C. and Virginia and omitting the 14 investigations Mr. Gudes conducted during the relevant time period in Maryland.

Dahlman is the only PSI who has not.[5]  As courts have repeatedly recognized, "[a]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous."  *Laurin v. Providence Hosp.*, 150 F.3d 52, 60-61 (1st Cir. 1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)); *see also Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007). Accordingly, the fact that the agency did not require Dahlman to complete death investigations for a period of time was not a concession that the function was non-essential.

Once it is determined that conducting death investigations is an essential function of the PSI position, Dahlman must identify a reasonable accommodation that would permit her to perform the function.  The only accommodation suggested by Dahlman is to eliminate the function from her job.  This suggestion is not one to accommodate Dahlman.  Instead it seeks

---

[5]  Because all other PSIs conduct death investigations, Dahlman's argument that she needs an opportunity to obtain discovery regarding "all performance appraisals for investigators in the field who did not perform death-related investigations" before the court may rule on summary judgment is unpersuasive.  (ECF No. 19-1 ¶ 8).  Dahlman has access to her own performance appraisals and there is no additional documentation that Defendant could provide in response to such a request.

to create a new position for her, something a party is not obligated to do under the Rehabilitation Act or the ADA. As the Fourth Circuit has noted "the statute speaks in terms of accommodations, not exceptions." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001); *see also Holbrook v. City of Alpharetta, Ga.*, 911 F.Supp. 1524, 1537 (N.D.Ga. 1995) ("if the employee is unable to perform the essential functions of the position with reasonable accommodations, then the employer has no duty to eliminate the essential functions of the position or to hire someone else who can perform those functions for the employee."), *aff'd by*, 112 F.3d 1522 (11th Cir. 1997).

Because Dahlman cannot establish that she was an otherwise qualified individual for the PSI position, it is not necessary to consider whether Defendant's decision to transfer Dahlman to the compliance division was a reasonable accommodation. Judgment will be granted for Defendant as to counts I-VI, which all pertain to Defendant's decision to deny the accommodation requested by Dahlman as a PSI and to transfer her to the compliance division. Additionally, judgment will be granted for Defendant on counts IX and X relating to the decision not to hire Dahlman for the PSI position created by her transfer because Dahlman could not fulfill all the requisite functions of the position.

**B.    Dahlman's Claims Arising From Her Tenure As A Compliance Officer**

**1.    Failure To Accommodate Counts**

Defendant does not argue that Dahlman could not perform the essential functions of the compliance officer position.  Indeed Dahlman was reassigned to this position because it did not require Dahlman to investigate deaths.   Instead, Defendant reasserts her argument that Dahlman failed to establish she suffered from a disability that substantially limits major life activities and also argues that Dahlman's requested accommodation was unreasonable and would have imposed an undue burden on the CPSC.

**a.    Individual with Disability**

Dahlman's disability and its effect on her ability to conduct major life activities did not substantially change from the time when she requested an accommodation as a PSI to the time she requested an accommodation as a compliance officer. The factual support Dahlman provided in connection with her second request for accommodation was more extensive.  The letter accompanying the second request from her new doctor, Norman Wilson, explained to some degree the impact of Dahlman's disorders on her ability to concentrate and her memory and the severe exhaustion she suffered.  (ECF No. 6-29, at 5).  While this evidence may ultimately be insufficient to establish that Dahlman's major life activities were substantially limited, at a

minimum this evidence is adequate to create a genuine dispute as to whether Dahlman's disability triggers Rehabilitation Act protection.

### b. Reasonable Accommodation

The next question is whether Defendant offered a reasonable accommodation for Dahlman's disability. The EEOC Regulations accompanying the ADA and applicable to the Rehabilitation Act require an agency to "make reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of its business." 29 C.F.R. § 1630.9(a). Under the ADA and Rehabilitation Act, the term "reasonable accommodation" may include, inter alia, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1614.203(b). An employer is not obligated to provide a qualified individual with the accommodation of the employee's choice upon demand; the employer must only provide a reasonable accommodation. *See Rehling v.*

*City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997); *Corrigan v. Perry*, 139 F.3d 888 (Table), 1998 WL 129929 at *9 (4th Cir. Mar. 24, 1998) (holding that employee cannot insist upon a particular accommodation).

In deciding whether a genuine issue of material fact exists regarding the reasonableness of the requested accommodation, courts must first examine whether the plaintiff has shown that her proposed accommodation is feasible or plausible. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002); *see also E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314-15 (4th Cir. 2008) (discussing analogous reasonable accommodation requirement under Title VII). If a plaintiff meets this burden, the employer must then show that the accommodation requested would cause it to suffer an undue hardship. *Id.*

Dahlman has met her initial burden and produced evidence that permitting her to telework for three days a week was at least plausible, although Defendant disputes her assertions. Dahlman has averred that almost all of her work can be performed from home so long as she obtains the relevant case files prior to her telecommute days. Dahlman also avers that, because she only meets with her supervisor on average once every one to two weeks, working from home sixty percent of the time would not result in undersupervision. (ECF No. 19-4 ¶ 29; ECF No. 19-41;

ECF No. 19-42).  Dahlman has also offered evidence that the accommodation offered by the CPSC is inadequate because the rest areas provided for her use on days when she does not telework are often occupied and the rooms do not contain a space for her to lie down, only a hard conference table and chair. (ECF No. 19-4 ¶ 30; ECF No. 36, at 2).  In addition, Defendant never confirmed or even attempted to confirm that the accommodation given to Dahlman was adequate.  (ECF No. 19-37, at 105).

To counter Dahlman's assertions Defendant has not offered overwhelming evidence that the requested accommodation was unreasonable or would present an undue burden.  There remains a genuine factual dispute with respect to this element.  As Defendant notes, in some cases courts have found an employer is not required to accommodate a disability by allowing the disabled worker to work at home without supervision.  (*See* ECF No. 6-1, at 34 (citing *Nanette v. Snow*, 343 F.Supp.2d 465, 474 (D.Md. 2004); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544-45 (7th Cir. 1995)).  In these cases, however, the employee was requesting to work exclusively at home.  *See Nanette*, 343 F.Supp.2d at 474-75*, aff'd by*, 143 F.App'x 551 (4th Cir. 2005); *Vande Zande*, 44 F.3d at 544-45.  Where employees seek only part-time telework, courts have concluded that reasonable jurors could deem this a possible accommodation.

*See, e.g., Freeman v. Chertoff*, 604 F.Supp.2d 726, 735–36 (D.N.J. 2009) (holding a reasonable jury might find that permitting plaintiff to telework two days a week was a possible accommodation).

Accordingly, Defendant's motion for summary judgment will be denied as to counts VII and VIII of Dahlman's complaint.

### 2. Harassment Count

To succeed on a claim for harassment under the Rehabilitation Act, a plaintiff must prove she: "(1) is a qualified individual with a disability; (2) was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis for imputing liability to the employer." *Edmonson v. Potter*, 118 F.App'x 726, 730 (4th Cir. 2004) (citing *Fox v. GMC*, 247 F.3d 169, 177 (4th Cir. 2001) (listing requirements for hostile work environment claim under ADA)). The "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking 'the ordinary tribulations of the workplace.'" *Wang v. Metro. Life Ins. Co.*, 334 F.Supp.2d 853, 864 (D.Md. 2004) (citing *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004)). The plaintiff must show that she not only subjectively believed her workplace

environment was hostile, but also that a reasonable person could perceive it to be objectively hostile. *Fox*, 247 F.3d at 178. To determine whether a reasonable person would perceive workplace conduct to be severe and pervasive, the court considers a number of factors, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 178. The conduct at issue must be far more severe than that of "a merely unpleasant working environment," *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.), *cert. denied*, 519 U.S. 818 (1996), and must be sufficiently "pervasive [so] as to become diffuse throughout every part of the . . . work environment in which plaintiff functioned." *Schweitzer-Reschke v. Avnet, Inc.*, 874 F.Supp. 1187, 1195 (D.Kan. 1995).

Defendant only briefly discusses this count in her motion and Dahlman does not discuss it at all in her opposition. The alleged acts of harassment previously identified by Dahlman and applicable to her tenure as a compliance officer include not assigning her substantive work for months, denying her training request, attempting to deny her requests for administrative leave to work on her EEO case, denying her requested accommodation of three days of telework per week and instead

arbitrarily assigning a different accommodation without consulting a medical professional regarding that accommodation, and instructing Dahlman to only bring questions or concerns about her work to her supervisor, Richard Stern, or supervisors in the Office of Compliance but not to her coworkers. (ECF No. 6-23, Pl's Resp. to Administrative Interrogatories, at 10-11). Most of the identified actions are insufficiently severe to constitute harassment in isolation. Many courts have held that denial of a training opportunity is not severe enough to constitute harassment or a hostile work environment. *See, e.g., Escalante v. Holder*, No. EP-09-CV-368-KC, 2011 WL 1528472 at *8 (W.D.Tex. Apr. 20, 2011) (citing *Hill v. Emory Univ.*, 346 F.App'x 390, 395-96 (11th Cir. 2009) (denial of request to attend training conference not sufficiently severe or pervasive)) (slip copy). Likewise receiving undesirable work assignments in the ordinary case will not sustain a hostile work environment claim. *See Allen v. Napolitano*, -- F.Supp.2d -- , 2011 WL 1192943 at *14 (D.D.C. Mar. 31, 2011) (claims that plaintiff was excluded from meetings, received unreasonable deadlines, denied training opportunities, and assigned busy work assignments not sufficiently severe or pervasive to support hostile work environment claim). When assessing allegations of workplace harassment, however, courts consider the totality of circumstances affecting the workplace environment and discrete

actions when considered in combination may alter the terms of employment. *See, e.g., Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (assessing claim of workplace harassment in violation of Title VII). Because neither party has fully addressed the allegations in this count, it is difficult at this stage of the litigation to make a final determination as to its viability. Accordingly, summary judgment will be denied.

### 3. Retaliation

Although the Rehabilitation Act does not have a specific retaliation provision, it incorporates the remedies applicable under the ADA including 42 U.S.C. § 12203(a) which makes it unlawful to retaliate against individuals for making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing regarding charges of disability discrimination. 29 U.S.C. § 794a; *see also Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001), *cert. denied*, 535 U.S. 933 (2002). A plaintiff can prevail on a retaliation claim either by offering sufficient direct and indirect evidence or under a burden shifting method. *Id.* For proof with direct evidence, "[w]hat is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 391-92 (quoting *Brinkly v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999)). Under the burden shifting method,

a plaintiff must first establish a prima facie case by showing that (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. *Id.* at 392 (citing *Haulbrook v. Michelin North America, Inc.*, 252 F.3d 696, 705-07 (4th Cir. 2001); *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)).

Not all actions deemed objectionable by a plaintiff will be adverse as a matter of law. "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardah P'ship*, 671 F.Supp.2d 729, 737 n.6 (D.Md. 2009). In the context of a Title VII retaliation claim the Supreme Court has explained that the definition of an adverse action "is simply not reducible to a comprehensive set of clear rules[,] . . . [but] the provision's standard for judging harm must be objective." *Thompson v. N. Am. Stainless, LP*, 131 S.Ct. 863, 868 (2011) (quotation marks omitted). Thus, an action is materially adverse if, from an objective point of view, "it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted).

Defendant maintains that none of the alleged retaliatory acts identified by Dahlman are sufficiently adverse to maintain a claim. (ECF No. 6-1, at 38). Primarily, Defendant argues that the actions alleged did not impact the terms, conditions, or privileges of Dahlman's employment. In opposing summary judgment, Dahlman did not address this argument.

To the extent the alleged actions might constitute a hostile work environment, they would be sufficiently severe to constitute adverse actions. In addition Dahlman's claim that Defendant failed to accede to her request to telework for 3 days a week and instead offered an inadequate accommodation as retaliation for the filing of an EEO complaint suffices by itself. Accordingly a jury may consider whether Defendant's actions were retaliatory and summary judgment on count XII will be denied.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss or for summary judgment filed by Defendant Inez Tenenbaum will be granted in part and denied in part. A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge